# OCTOBER TERM, 1899.*

WETHERBEE v. MICHIGAN CENTRAL RAILROAD CO.

MUNICIPAL CORPORATIONS—CONTRACT WITH RAILROAD—OVERHEAD CROSSING—ULTRA VIRES.

A city, pursuant to a vote of the electors, entered into a contract for the payment of a sum of money to a railroad company for erecting a bridge to carry over the tracks a street that had formerly been crossed at grade. The company agreed to maintain the masonry and foundations, but turned the superstructure and approaches over to the city, which took possession, and thereafter made certain repairs, resulting in an accident by which plaintiff was injured. It did not appear that the company was under any legal obligation to change the grade crossing to an overhead crossing. *Held*, that, even if the contract of the city was *ultra vires*, the company was not liable for the injuries.

Error to Wayne; Carpenter, J. Submitted October 24, 1899. Decided November 14, 1899.

Case by Edson Wetherbee against the Michigan Central Railroad Company for personal injuries. From a judgment for defendant on verdict directed by the court, plaintiff brings error. Affirmed.

*Lehman Bros.* and *F. J. Riggs*, for appellant.

*Henry Russel* (*Lawrence & Butterfield*, of counsel), for appellee.

MOORE, J. The tracks of the defendant extend along the valley of the Huron river, which divides Ann Arbor into upper and lower town. The street from lower town branches into two streets leading into the upper town

---

* Continued from Vol. 121.

about where the railroad track crosses the streets. The railroad track was laid in 1838, and until about 1886 crossed the streets at grade. The streets between the lower and upper town had a great deal of traffic upon them, and from the railroad track to the upper town the grade of the streets for a long distance was very considerable. The railroad company was about to build a new station, and to make very considerable changes in its yard. It was desirable, not only for the railroad company, but for the public, that these important streets, instead of crossing the railroad tracks at grade, and at the foot of a long, steep hill, should be carried over the railroads, thus avoiding in part the grade and the dangers incident to a grade crossing. To accomplish this purpose, it was necessary to carry the streets over the railroad tracks upon a bridge. The common council entered into negotiations with the railroad company for the purpose of bringing about this result. It submitted the question of raising $5,000 for the purpose of building this bridge to the taxpayers, who voted, at an election, authority to raise that sum to build the bridge. The city then entered into a contract with the railroad company, by which, among other things, it was to construct a bridge over its tracks, connecting Pontiac and Broadway streets, with approaches of a grade not exceeding 6 feet in 100. The railroad company agreed to maintain the masonry and foundations of said bridge at its own expense, and, when completed, "to deliver the said bridge and its approaches, with sidewalks and fences, as aforesaid, into the possession of said city, free of all liens." The city paid to the company the $5,000 which it agreed to pay. The railroad company performed its part of the contract, including the building of the bridge, which it put into possession of the city, and over which the city afterwards exercised, by its proper officers, control.

In March, 1895, the plaintiff was injured because of alleged defects in the planking of the bridge, and sued the defendant to recover damages. The circuit judge directed

a verdict in favor of the defendant for reasons he stated as follows:

"This bridge upon which the plaintiff was injured was erected under an agreement between the city of Ann Arbor and the railroad company. That agreement, without undertaking to read it to you, contained these significant provisions: That the railroad company, after it was built, would maintain the foundations and masonry, and it would turn the possession of the bridge and the approaches over to the city of Ann Arbor. Now, looking at the agreement alone, clearly its proper legal construction would imply that, after the bridge was built and turned over to the city, the burden of maintaining the superstructure would be upon the city, and not upon the railroad company. I do not think that proposition can be seriously controverted. But it is insisted that legal effect cannot be given to that agreement, because it is contended that the law placed upon the railroad company the legal obligation of maintaining this superstructure, and therefore the city of Ann Arbor could not relieve the railroad company from that obligation, and itself assume it. In support of this contention, plaintiff's counsel call my attention to two cases, one in the State of Massachusetts and one in the State of Iowa. In those cases it was decided that, where a railroad company built a bridge over a highway crossing, a municipality had no right to enter into an agreement relieving it (the railroad company) from the obligation to keep the bridge in repair. Now, at first blush it seems as though those cases control this case, and the strong way in which they were presented made me question what I otherwise supposed was settled law; but reflection and study and comparison of those cases with this has led me to the conclusion that they have no application here. In those cases there was a clear legal obligation on the part of the railroad company to build that bridge. It had to build it in order to put the highway in the condition which the law required it to be put in by the railroad company, and there followed a legal obligation to maintain that bridge; so that there was no reason and no consideration for the municipality agreeing to take that burden upon itself. Now, is there, in this case, any such obligation? It appears that, for a good many years before this bridge was built, there was a grade crossing at this point. The railroad company was under no legal obligation to change that grade crossing into an overhead crossing. It is

argued that it might have been made to assume that obligation if proper action had been taken before the commissioner of railroads. That is possible. It is possible that the circumstances are such that, if they had all been presented to the railroad commissioner, he would have said that public convenience and public safety at that point demanded such a change to be made. But he did not say that. The case was not presented to him, and, until he did say so, there was no legal obligation upon the railroad to make that change. The city of Ann Arbor chose, instead of that, to enter into an agreement whereby that change should be made. In other words, the railroad company never was placed in a position where there was any legal obligation resting upon it to build this bridge, and, consequently, no legal obligation to afterwards maintain it. So that I am clearly of the opinion that the Massachusetts case and the Iowa case do not control this case, and furnish no precedent for its decision."

From this action of the trial judge the plaintiff appeals, contending:

1. That the contract between the city and the railroad company was *ultra vires*, and therefore void.

2. That the railroad company could not, by contract, escape its liability to respond in damages for injuries received at street crossings.

3. That, even though the city was liable, the railroad company was also liable.

The counsel cite many authorities, but rely chiefly upon *Dygert* v. *Schenck*, 23 Wend. 446 (35 Am. Dec. 575); *Kelly* v. *Railroad Co.*, (Sup.) 9 N. Y. Supp. 90; *Tierney* v. *City of Troy*, 41 Hun, 120; *Gates* v. *Railroad Co.*, 150 Pa. St. 50 (16 L. R. A. 554); *City of Newton* v. *Railway Co.*, 66 Iowa, 422; *Rouse* v. *City of Somerville*, 130 Mass. 361. We do not think any of these cases is conclusive in favor of the contention of counsel. All of these cases, except the first one, were cases where the law imposed upon the railroad company the duty to keep the crossing or the bridge in repair. In most of the cases the duty was imposed by the statute. In the case of *Dygert* v. *Schenck*, *supra*, the following language is used:

"Had the town agents actually taken the bridge under

their care, and repaired it for a long time, there might have been a question for the jury whether they had not made it a town bridge."

So far as this case has any bearing upon the controversy, it is in favor of the position of the defendant.

The case at bar is not the case of an injury at such a crossing as the railroad company was under legal obligation to maintain. For many years it maintained its tracks across the streets at grade. No action was taken by which it could legally be compelled to keep anything but a grade crossing in repair. Because of the public benefit to accrue therefrom, the common council made an arrangement by which the streets should be extended over the tracks of the railroad at its expense. So far as the superstructure was concerned, the bridge was to be under the control of the city, to be maintained at its expense.

It is not necessary for us to inquire, in this proceeding, whether the city exceeded its authority in making this arrangement or not. It in fact caused the bridge to be built. It took control of it, and, through its street commissioner, caused the pieces of plank to be nailed on the bridge which the declaration averred, and the testimony offered by the plaintiff tended to show, caused the accident.

The circuit judge was right in his disposition of the case. Judgment is affirmed.

The other Justices concurred.